

FILED

JAN 15 2020 KV

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**TERESA CLARK,**
An individual,
Plaintiff,

v.

**CHARLES TOWERS, LLC,** a
A for-profit company;
**SOUTHERN MANAGEMENT CORPORATION,** a for-profit
Corporation; **CANDY WONGSAM,**
An individual,

Defendants.

Case 1:20-cv-00302
Judge Marvin E. Aspen
Magistrate Jeffrey Cole

**COMPLAINT**

## I. INTRODUCTION

1. Plaintiff TERESA CLARK ("Clark") a tenant at Charles Towers, an apartment complex owned by Defendant CHARLES TOWERS, LLC, ("Charles Towers") and operated by Defendant SOUTHERN MANAGEMENT CORPORATION ("Southern". Defendant CANDY WONGSAM, is, or was at all times relevant, an employee and agent of Southern. Plaintiff sues defendants for violation of the Fair Housing Act, 42 U.S.C § 3601, *et seq.,* related state laws, and for conversion of personal property.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C §1331. Additionally, this Court has supplemental jurisdiction over Plaintiff's state law claims under 28

U.S.C §1367 because those claims are related to Plaintiff's federal claims, and arise out of a common nucleus of related facts.

## III. PARTIES

3. Plaintiff Teresa Clark has been diagnosed with bipolar disorder, making her a person with a disability within the meaning of the Fair Housing Act, 42 U.S.C. § 3601(h) and the Illinois Human Rights Act, 775 ILCS 5/1-103(I).

4. Defendant Charles Towers, LLC, is a for-profit limited liability company organized under the laws of the state of Maryland.

5. Defendant Southern Management Corporation is a for-profit corporation organized under the laws of the state of Maryland.

6. Charles Towers, LLC owns the apartment complex located at 222 Charles Street, Baltimore, Maryland, 21201.

7. Southern Management Corporation operates the Charles Towers apartment complex.

8. Charles Towers is a dwelling within the meaning of the Fair Housing Act, 42 U.S.C. §3602(b), and conducts Real Estate Transactions within the meaning of the Illinois Human Rights Act, 775 ILC 5/1-203.

9. Defendant Candy Wongsam is a Building Manager for Southern Management Corporation.

10. Each defendant was, at all times relevant, the agent, employee or representative of each other defendant. Each defendant, in doing the acts or in omitting to act as alleged in this Complaint, was acting within the course and scope of his or her actual or apparent authority

pursuant to such agency, or the alleged acts or omissions of each defendant as agent were subsequently ratified and adopted by each defendant as principal.

## IV. FACTS

### Discriminatory Acts

11. Defendant Charles Towers, LLC owns the property "Charles Towers," located at 222, Charles Street Homes, Baltimore, MD, 21214.

12. In March 2015, Clark applied for, and was granted, a yearly lease at Charles Towers.

13. At all times between March 2015 and January 2018, Clark lived in the same apartment in Charles Towers.

14. In May of 2017, Clark's lease was on a month-to-month basis.

15. In May 2017, Defendants began repair work in Clark's apartment with an estimated to be completed in a few days.

16. Work in Clark's apartment lasted almost a month.

17. In that time, workers employed by Defendants and left Clark's apartment without leaving notice or obtaining permission.

18. At that time, Clark contacted Defendant Candy Wongsam and alerted her to the ongoing work and entrance of worker's into her apartment, and informed her that she felt unsafe in her apartment.

19. Clark attempted to withhold rent believing she was in her right to do so because of the unwanted intrusions of worker's into her apartment. Defendants and Clark resolved this issue outside of court.

20. At that time, Clark began experiencing symptoms of bipolar disorder.

21. As a result of these symptoms, Clark was late on rent on several occasions. Defendant Candy Wongsam was contacted by Clark's father who attempted to pay Clark's rent. Defendant refused to accept payment. Clark did not violate other terms of her lease.

22. In August 2017, Defendants served Clark with a 60 Day Notice to Evict with no demand for payment and no option to cure.

23. Defendant Candy Wongsam told Clark's father via e-mail that Clark's mental disability was the reason Defendants were evicting her.

24. One or more of the Defendants sued Clark for Possession of her apartment in Fall 2017.

25. Clark was present at the Hearing for eviction on November 20, 2017.

26. Clark left the courthouse with the understanding that she and Defendant's counsel had reached an Agreed Order under which Clark would voluntarily leave without an eviction being entered.

27. After Clark left the courtroom, an Order for Possession was entered for Defendant. Clark was evicted by the Sheriff in mid-January, 2018.

**Conversion**

28. Clark was forced to leave her possessions in the apartment when she was evicted.

29. Defendant Candy Wongsam verbally promised Clark that Defendants would store the contents of her apartment for 30 days after the eviction.

30. Within 30 days, on multiple occasions Clark personally attempted to contact Defendants for the return of her property.

31. Within 30 days, on multiple occasions members of Clark's family attempted to contact Defendants for the return of her property.

32. Within 30 days, Clark's case manager at the shelter at which Clark then resided attempted to contact Defendants for the return of her property. See Attached Exhibit A.

33. Defendant's possession of property became unauthorized when Clark and her case manager attempted to have her property returned to her,

34. In Spring of 2018, one or more of the Defendants e-mailed Clark and informed her they had disposed of all of her property.

**Plaintiff's Injuries**

35. By reason of defendants unlawful acts, Clark as suffered economic loss, loss of time and effort; emotional distress, including humiliation, mental anguish, loss of dignity, and embarrassment. Defendants deprived Clark of the use and enjoyment of her dwelling, removed her from her home, separated her from all of her personal belongings, obstructed her attempts to retrieve her property. Therefore, Clark is entitled to actual and compensatory damages.

Clark is entitled to actual damages in the form of the value of her converted property as follows:

a) Dining room chairs, office chair, computer monitor, television, books, general décor, kitchen ware, valued at $1800;

b) Dresser, coffee table, book shelf, valued at $1300;

c) Clothing including

i) J Crew brand suits, dresses, and cashmere sweaters, value: $4,500

ii) Gap brand suits, dresses, and misc. clothes, value: $1,500

iii) Banana Republic band suits, silk shirts, value: $2,000

iv) Ann Taylor brand suits and dresses, value: $1,500

v) Nordstrom brand shoes, bags, dresses and misc. clothes, value: $5,000

d) Pier One brand wall art, value $300

e) Laptop, value $600

f) Printer, value $60

g) Right and Left handed sets of golf clubs, value $400

h) Dining room table, value $300

i) Indoor plant décor, value $200

j) Bed, couch, misc. wall décor, value $3,000

k) Hobby tools and supplies, value $500

## V. CLAIMS

### A. First Claim

### [Fair Housing Act]

36. Plaintiff realleges and incorporates by reference each paragraph previously alleged in this complaint.

37. Defendants injured Plaintiff by committing discriminatory housing practices in violation of the federal Fair Housing Act, 42 U.S.C. § 3601, et seq.

### B. Second Claim

### [Illinois Human Rights Act]

38. Plaintiff realleges and incorporates by reference each paragraph previously alleged in this complaint.

39. Defendants injured Plaintiff by discriminating against her in violation of the Illinois Human Rights Act, 775 ILC 5 et seq.

**C. Third Claim**

**[Conversion]**

40. Plaintiff realleges and incorporates by reference each paragraph previously alleged in this complaint.

41. Plaintiff owned all personal property located in her apartment at Charles Tower, and had absolute and unconditional right to immediate possession of that property.

42. Plaintiff, on numerous occasions by herself and with the help of family members and staff at a shelter made demand for the property. Plaintiff incurred expenses showed effort to retrieve her possessions by leasing a storage space. See Attached Exhibit C.

43. Plaintiff was refused entrance into Charles Towers when she requested to speak to Defendant Candy Wongsam about the return of her property.

44. Plaintiff personally went to Defendant Charles Towers, LLC to attempt to find the location of her property. Defendant called the local police to remove her from the premises without informing her of the location of her property or the return of the property.

45. Defendant refused to participate in community mediation regarding the return of Plaintiff's property. See Attached Exhibit B.

46. Defendant refused to communicate through a case manager at the shelter where Plaintiff was residing after she was evicted. See Attached Exhibit A.

47. Defendant(s) wrongfully and without authorization assumed control, dominion, and ownership over Plaintiff's property.

48. Defendants injured Plaintiff when they refused to return her property and disposed of it in violation of applicable common law in the State of Illinois.

## VI. RELIEF

WHEREFORE, Plaintiff prays for entry of a judgment against Defendants that:

1. Awards actual and compensatory damages under the Fair Housing Act, 42 U.S.C. § 3613(c), the Illinois Fair Housing Act, 775 ILC 5, and for Conversion;

2. Awards punitive damages under the Fair Housing Act, 42 U.S.C. §3613(c);

3. Awards costs of suit, including reasonable attorney's fees; and,

4. Awards all such other relief as the Court deems just.

Dated: January 7, 2020.

Respectfully submitted,

Teresa Clark

Teresa Rose Clark
Plaintiff
5847 N Paulina Street
Chicago, IL, 60660
(p) (502) 716-4277
teresarclark@yahoo.com

Exhibit A - Caseworker Letter




MANNA HOUSE, INC.

Saleem Gauhar
Executive Director
saleem.gauhar.manna@gmail.com

435 East 25th Street / Baltimore, MD 21218
410-889-3001 / FAX 410-889-3298 / www.mannahouseinc.org

August 16, 2019

RE: Teresa Clark

To Whom It May Concern:

Manna House is a soup kitchen and drop-in center that provides food and various other services, including case management, to homeless and low-income people in Baltimore.

Teresa Clark came in as a homeless woman seeking assistance in February and March of 2018. Her original eviction court date was November 20, 2017 and there was another in January, 2018. At both, she was very ill and unstable so was unprepared to effectively represent herself. She had been evicted in January from the Charles Towers at 222 N. Charles Street in Baltimore. The property management company was holding all of her property in the apartment and would not allow her back into the building to move it out. According to Ms. Clark, they threatened to call the police every time she went there to retrieve her belongings.

Ms. Clark asked me for assistance with this situation. I spoke with the property management office to see if we could make arrangements to move everything. I was trying to ascertain the location and condition of her things (in the unit, in storage, packed/unpacked). I could not get a straight answer; they were being generally uncooperative.

Ms. Clark went to Legal Aid to ask for help before she was evicted. They gave her some advice and on the day of the eviction they called the property manager to confirm that she would be getting her things. According to Ms. Clark they had agreed to store her things for 30 days until mid-February and then gave her another extension until mid-March. Legal Aid wanted to confirm that they were storing them and where and get the name of the correct contact person for this issue.

Ms. Clark has no family in the area. Her father, who lives out of state, had also been in communication with the building but, according to him, they were being really shady.

Any assistance you can provide with respect to this issue would be appreciated.

Sincerely,

Patty Feick
Case Manager

Exhibit B - Mediation Letter

January 26, 2018

Teresa Clark
8 Charles Plaza Apt 802
Baltimore, MD 21201

Dear Teresa Clark, 28974

Baltimore Community Mediation Center (BCMC) is not able to schedule mediation at this time and has closed your file. We cannot give the specific reason, but some of the possible reasons are:

•We have been unable to contact one or more participants due to lack of, or incorrect contact information.
•One or more participants have not responded to a reasonable attempt to contact them.
•One or more participants declined to participate.
•Mediation was scheduled but one or more participants did not attend and we have been unable to reschedule for one or more of the above reasons.
•The situation was determined to be inappropriate for mediation service.

Specific details regarding mediation communication are confidential under Maryland law.*
The file can always be reopened if circumstances change. If you have any questions feel free to call us at (410) 467-9165 ext. #. Please also keep us in mind for other situations and or for others you may know who may be interested in requesting mediation service.

Alexa Del Piano
Mediation Coordinator

BCMC File Number: 28974

Confidentiality:
*Mediation communications will remain confidential in accordance with Code of Maryland Section 3-1802 and Judiciary Rule Title 17 which state that mediators and mediation participants "may not disclose or be compelled to disclose mediation communication in any judicial, administrative, or other proceeding." BCMC mediators

DocuSign Envelope ID: E654D494-6D49-4607-8ADB-299B7C0D9837

Exhibit C - Storage Lease

**ExtraSpaceStorage.**

602 N Howard St
Baltimore, MD 21201
(443) 845-9705

*Professionally managed by:*
*EXTRA SPACE MANAGEMENT, INC.*
*2795 E. Cottonwood Pkwy, Suite 400*
*Salt Lake City, UT 84121*
*(888) STORAGE*

**Rental Agreement Date:** 2/12/2018
**Account ID:** 1004460084
**Space Number:** 6010
**Approximate Size:** 10X10
**Monthly Rental Charge:** $120.00
**Monthly Due Date:** 12
**Paid Through Date:** 3/11/2018
**Monthly Billing Election:** N

**CUSTOMER**

| | |
|---|---|
| Name | Teresa Clark |
| Address | 10 North Pulaski St |
| City, State ZIP | Baltimore MD 21223 |
| Cell Phone | (410) 889-3001 |
| Alternate Phone | (410) 889-3001 |
| Identification | MD C-462-789-744-141 02/23/2025 |
| Date of Birth | 2/23/1977 |
| E-mail | teresarclark@yahoo.com |

**ALTERNATE CONTACT**

| | |
|---|---|
| Name | |
| Address | |
| City, State ZIP | |
| Cell Phone | |
| Alternate Phone | |
| Authorized for Access? | |

*If alternate information is refused, Customer must sign here.* X DocuSigned by: Teresa Clark 2500660A26564D1...

**Others Authorized for Access (other than Customer):** ____, ____, ____
* Operator, in its sole discretion, may provide any individual(s) authorized for access in this Agreement with gate code, unit no., account information, and assist with lock cutting

| Addendums | Is there a lien on any of the items to be stored? If yes, Lien Addendum is required. | Is a vehicle that requires state registration being stored? If yes, Vehicle Addendum is required. | Is Customer or Customer's spouse a service member in the military? If yes, Military Addendum is required. | Is Customer a business? If yes, Business Addendum is required. |
|---|---|---|---|---|
| | Yes ____ No X | Yes ____ No X | Yes ____ No X | Yes ____ No X |

**General Description of Property Stored:** household goods.... 1 bedroom apt

**Declared Value of Property Stored:** $10,000.00

**Customer acknowledges that the information provided above is accurate and current.** X DocuSigned by: Teresa Clark 2500660A26564D1

THIS RENTAL AGREEMENT ("**Agreement**") is executed on the date stated above by and between EXTRA SPACE MANAGEMENT, INC., as agent for the Facility's owner ("**Operator**") and the individual or business listed above ("**Customer**") for the purpose of renting the space listed above (the "**Space**") which is part of a larger facility (the "**Facility**"). **CUSTOMER HAS EXAMINED THE SPACE AND FACILITY AND ACCEPTS THEM "AS IS." Customer acknowledges and agrees the measurements noted for the Facility and the spaces located thereon are an approximation only, that Space size is estimated per Building Office Management Association standards and does not refer to usable space, that the size of the Facility and any referenced sizes are approximate, given for illustration only and may vary materially.** Operator does not represent or guarantee the safety of the Facility or the personal property stored by Customer. **THE RULES AND REGULATIONS POSTED AT THE FACILITY, IF ANY, ARE BY REFERENCE MADE PART OF THIS AGREEMENT,** which rules and regulations may be modified by Operator to assist with the operation, safety, and cleanliness of the Facility. The Facility is operated in accordance with state and local laws governing self-storage facilities in the state where the Facility is located, which are herein incorporated by reference.

**TERM, MONTHLY RENTAL AMOUNTS AND OTHER CHARGES**

1) The term of this Agreement begins on the Rental Agreement Date listed above and shall continue on a **MONTH-TO-MONTH** basis until terminated.
2) The first Monthly Rental Charge and a one-time, non-refundable, administration fee shall be paid on the Rental Agreement Date listed above. Thereafter, the Monthly Rental Charge shall be due on the same day every month (the "**Monthly Due Date**"). The period between consecutive Monthly Due Dates is referred to as the "**Rental Month** ". The last day of the Rental Month for which all Monthly Rental Charges have been paid is the "**Paid Through Date**." Customer shall pay Operator at the Facility's rental office, the Monthly Rental Charge, taxes and insurance in advance, without prior notice or billing from Operator. **NO MONTHLY BILLS OR STATEMENTS WILL BE SENT TO CUSTOMER UNLESS ELECTED ABOVE**. If Customer elects to receive monthly billing, a monthly service charge of $1.00 shall be added to Customer's account.



3) **If Customer does not pay the Monthly Rental Charge by the 5th day following Customer's Paid Through Date, Customer shall pay a late fee of $20.00 or 20% of the Monthly Rental Charge, whichever is greater. Operator may charge a late fee for each month Customer fails to pay the Monthly Rental Charge by the 5th day following the Paid Through Date. Late Fees will be assessed on or after the 6th day following Customer's current Paid Through Date.** Any late fees incurred by Customer are a service charge and not a penalty. Partial payments will not be accepted, however, if a partial payment is accepted it will be at the sole discretion of Operator and if accepted will first be applied to fees and service charges, then to Monthly Rental Charges, taxes and insurance. If at the close of business on the 30th day following the Customer's current Paid Through Date, the Monthly Rental Charge or other charges still remain past due, a pre-foreclosure fee of **$85.00** will be assessed and Customer must pay such amount by cash, credit card, or by certified funds. No personal/company checks will be accepted for past-due payments. It is agreed to and understood that partial payments made to cure a default for nonpayment of rent will not delay or stop foreclosure and sale of Customer's property. The tender of partial payments, if accepted, shall not serve to waive or avoid the legal effect of prior notices given to Customer. Only full payment on Customer's account prior to the published auction date will stop a scheduled sale of the property.

4) Credit card is Operator's preferred method of receiving payment. If credit card information is provided by Customer to Operator, Customer authorizes Operator to charge Customer's credit card on or near the Monthly Due Date for Monthly Rental Charges, taxes, insurance, and other fees as applicable unless otherwise directed by Customer. It shall be Customer's sole responsibility to provide Operator with accurate, current and working credit card information. The failure to provide such may result in non-payment of Monthly Rental Charges and other accrued charges, allowing Operator to sell Customer's personal property pursuant to Section 20 below. It shall be Customer's sole responsibility to verify that payments are made and by what method payments are made. Customer may manage payment options at www.extraspace.com using the account management tool or in person at the Facility's office.
Customer Initials ______

5) Any checks returned for insufficient funds will result in a $25.00 service charge to Customer, and the returned check amount and service charge must be re-paid by cash, credit card, or money order. Customer shall not be permitted to pay with a check after two checks have been returned for insufficient funds.

**ACCESS**

6) Customer shall have access to the Space and the Facility only during such hours and days as are regularly posted at the Facility, which are subject to change by Operator. If Monthly Rental Charges or other charges remain unpaid for five (5) days following the Monthly Due Date, unless otherwise prohibited by law, Operator may restrict or deny Customer's access to the Space and/or Facility. If Customer is renting more than one Space at any given time, default on one rented Space shall constitute default on all rented Spaces, entitling Operator to deny access to Customer on all rented Spaces.

7) Customer shall provide one lock for the rental Space sufficient to secure Customer's personal property. Customer shall not provide Operator or Operator's agents, authorized representatives and employees (collectively "**Operator's Agents**") with a key to Customer's lock.

8) Customer grants Operator and Operator's Agents or any governmental authority access to the Space: a) upon three (3) days prior written notice, b) upon default of the Agreement by Customer for thirty (30) days, c) in emergency circumstances (defined as imminent injury to persons or property), or d) as required by law. If Customer fails to grant access, Operator, Operator's Agents or the agents of any governmental authority shall have the right to remove Customer's lock and enter the Space to examine the contents, to make repairs or alterations, to take reasonable steps to preserve the Space, to comply with the law, or to enforce Operator's rights; including the right to relocate Customer's belongings if necessary.

9) Customer shall safeguard any property stored at the Facility. It is Customer's sole responsibility as to those persons who are given access to Customer's Space and Operator shall not be liable for anyone other than Customer entering the Space unless by Operator's gross negligence.

**LIMITATIONS ON USE OF THE SPACE AND FACILITY**

10) Customer shall not make or allow any alterations to the Space. Customer agrees that the Space and Facility shall be used solely for the storage of personal property. Customer shall not loiter about the Facility, spend excessive or unnecessary time in or around the Space or interfere with the use of the Facility by other customers of Operator. Customer shall not use the Space for any unlawful purpose and expressly agrees not to use the Space for human or animal habitation. Customer shall not store in the Space or at the Facility anything to which any other person or business has right, title, or interest. Customer represents and warrants that there are NO LIENS OTHER THAN OPERATOR'S LIEN UPON THE PROPERTY STORED. A Lienholders Addendum to this Agreement must be completed if there are any lienholders on any stored property and for each stored vehicle, absent which such vehicle will be deemed unauthorized and be subject to removal from the Space and Facility. The storage of food and any perishable goods is strictly prohibited. The use of electricity in the Space is strictly prohibited unless agreed upon in writing by Operator. **IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT CUSTOMER SHALL NOT STORE OR USE IN THE SPACE OR AT THE FACILITY ANY HAZARDOUS OR TOXIC MATERIALS OR ANY INHERENTLY DANGEROUS OR FLAMMABLE SUBSTANCE.**

11) Customer agrees that the Space is not appropriate for the storage of jewels, furs, heirlooms, art works, collectibles or other irreplaceable items having special sentimental or emotional value to Customer and Customer agrees not to store said items. Customer hereby waives any claim for sentimental or emotional value for Customer's property that is stored in the Space or at the Facility.

12) If the Space is so equipped, Customer is prohibited from storing any items within 18" of the clearance to the fire sprinkler head diffuser for life safety reasons. Customer acknowledges that any items stored within 18" of the clearance of the fire sprinkler head diffuser may be removed by Operator and placed in a separate space without notice to Customer, all at Customer's expense.

**LIMITATION OF OPERATOR'S LIABILITY AND INDEMNITY**

13) **OPERATOR IS NOT A WAREHOUSEMAN ENGAGED IN THE BUSINESS OF STORING GOODS FOR HIRE, AND NO BAILMENT IS CREATED BY THIS AGREEMENT. OPERATOR EXERCISES NEITHER CARE, CUSTODY, NOR CONTROL OVER CUSTOMER'S STORED PROPERTY AND ALL PROPERTY STORED WITHIN THE SPACE OR AT THE FACILITY BY CUSTOMER SHALL BE STORED AT CUSTOMER'S SOLE RISK.**

14) Operator and Operator's Agents shall not be liable to Customer for any damage or loss to any person or property at the Facility and to any property stored in the Space, arising from any cause whatsoever, including, but not limited to, theft, fire, mysterious disappearance, mold, mildew, water, rain, rodents, insects, acts of God, partial or sole negligence or failure to act of Operator or Operator's Agents, except for damage or loss resulting from Operator's fraud, gross negligence or willful violation of law. Customer shall indemnify and hold Operator and Operator's Agents harmless from any and all damage, loss, or expense arising out of or in connection with any damage to any person or property, occurring in the Space or at the Facility arising in any way out of Customer's use of the Facility, even if such damage or loss is caused entirely or in part by the negligence of Operator or Operator's Agents. Operator and Operator's agents and employees shall not be liable whatsoever to any extent to Customer or Customer's invitees, family, employees, agents or servants for any personal injury or death arising from Customer's use of the Space or Facility from any cause whatsoever including, but not limited to, the active or passive acts, omissions or negligence of Operator or Operator's Agents.

15) Climate controlled spaces are heated and cooled depending on outside temperature. These spaces do not provide constant internal temperature or humidity control. Operator does not warrant or guarantee temperature or humidity ranges in the Space due to changes in outside temperature and

DocuSign Envelope ID: E654D494-6D49-4607-8ADB-299B7C0D9837

humidity, or due to other considerations, and Customer understands and assumes the risk of climate controlled spaces not meeting certain temperature and humidity requirements.

16) **Customer agrees that the total value of the property stored shall not exceed $5,000 unless Operator has agreed in writing for Customer to store property exceeding $5,000; provided that Customer agrees that Operator's maximum liability to Customer for any claim or suit by Customer, including but not limited to any suit alleging wrongful foreclosure or sale of Customer's property is $5,000. This section shall not create any liability on the part of Operator to Customer for any loss or damage to Customer's property, regardless of cause.**
17) No promises or representations of safety or security have been made to Customer by Operator or Operator's Agents. There shall be no liability to Operator, Operator's employees or agents in the event alarm, video system or sprinkler system, or any components thereof, shall fail or malfunction. **Video recording devices are not monitored.**
18) Operator's Agents are not authorized or permitted to make any warranties about the Space or the Facility. Operator's Agents' ORAL STATEMENTS DO NOT CONSTITUTE WARRANTIES and shall not be relied upon by Customer. The entire agreement and understanding of the parties hereto are embodied in this writing and NO OTHER WARRANTIES are given.

**INSURANCE**

19) **Customer shall maintain comprehensive insurance coverage of at least 100% of the actual cash value of all personal property stored in the Space against damage by water, fire, extended coverage perils, vandalism and burglary. To the extent Customer does not maintain insurance for the full value of the personal property stored, or fails to maintain insurance at all, Customer bears all risk of loss or damage.** Customer hereby releases Operator and Operator's Agents from any and all claims for damage or loss to personal property that are caused by or result from perils that are, or would be, covered under the required insurance policy and hereby waives any and all rights of recovery against Operator and Operator's Agents in connection with any damage which is or would be covered by any such insurance policy. **CUSTOMER'S PERSONAL PROPERTY STORED IN THE SPACE OR AT THE FACILITY IS NOT INSURED BY OPERATOR AGAINST LOSS OR DAMAGE.**

**OPERATOR'S LIEN AND RIGHT TO ENFORCE UPON NONPAYMENT**

20) **CUSTOMER ACKNOWLEDGES AND AGREES THAT CUSTOMER'S PERSONAL PROPERTY STORED AT THE FACILITY WILL BE SUBJECT TO A CLAIM OF LIEN IN FAVOR OF OPERATOR FROM THE DATE THE MONTHLY RENTAL CHARGE AND OTHER CHARGES ARE DUE AND UNPAID, AND FOR EXPENSES REASONABLY INCURRED IN THE SALE OR DISPOSITION OF CUSTOMER'S STORED PERSONAL PROPERTY. OPERATOR MAY SELL CUSTOMER'S PERSONAL PROPERTY IN A COMMERCIALLY REASONABLE MANNER AFTER GIVING CUSTOMER REASONABLE NOTICE, IN ORDER TO SATISFY SUCH LIEN. CUSTOMER AGREES THAT ANY SPACE ADVERTISED AND SOLD USING AN ONLINE AUCTION PROVIDER IS DEEMED TO BE SOLD IN A COMMERCIALLY REASONABLE MANNER.**

    **A sale of Customer's personal property stored in the Space to satisfy the lien if Customer is in default may be advertised (i) in a newspaper of general circulation in the jurisdiction where the sale is to be held, (ii) by electronic mail, or (iii) on an online website (including but not limited to the website referenced in Section 22 below).** Customer Initials tl

    Operator may enforce Operator's Lien by selling Customer's stored personal property at public sale, in accordance with the provisions of applicable law, and apply the net proceeds from such sale to the payment of all sums due to Operator. This remedy is cumulative with and in addition to every other remedy given hereunder or hereafter existing at law or in equity. It is further understood that the date of sale of Customer's property pursuant to this section, if applicable, shall constitute the date of termination of this Agreement. In the event of a foreclosure of Customer's interest in the Space, it is understood and agreed that the liability of Customer for the rents, charges, costs and expenses provided for in this Agreement shall not be relinquished, diminished or extinguished prior to payment in full. Operator may use a collection agency to secure any remaining balance owed by Customer after the application of sale proceeds, if any. If any property remains unsold after foreclosure and sale, Operator may dispose of said property in any manner considered appropriate by Operator in its sole discretion.

21) Any time prior to lien sale, any person claiming a right to Customer's liened property may stop the sale by **paying in full in the form of CASH ONLY** all amounts owed. Upon release of such property to the payor, Operator shall have no further liability to any person for the liened property.
22) In addition to any other requirements of applicable law, Operator may post information relating to any public sale resulting from Operator's enforcement of its lien at the following website: http://auctions.extraspace.com.
23) **If Customer is at least 60 days delinquent and Customer's stored property is a motor vehicle or watercraft, in lieu of sale pursuant to Section 20 above, Operator may tow or cause to be towed from the Facility, such motor vehicle or watercraft. Operator is not responsible for damage or loss once tower takes possession.**

**EVENT OF DEFAULT**

24) If Customer shall fail or refuse to perform any of the covenants, conditions or terms of this Agreement, or in the event Customer files a voluntary petition in Bankruptcy or suffers a petition in involuntary bankruptcy to be filed against him/her, Customer shall be deemed in default in the performance of this Agreement, except as limited by law. Nothing contained in this Agreement shall be construed as limiting Operator's rights and remedies as provided under the laws of the state where the Facility is located. In the event of a default, and without prejudice to any other remedies, Operator may (a) terminate this Agreement, or (b) seize and sell the personal property pursuant to Section 20 above.

**TERMINATION OF THE AGREEMENT AND VACATING THE SPACE**

25) Customer must provide Operator ten (10) days notice prior to vacating the Space and terminating this Agreement. Operator shall not be required under any circumstance to refund Customer's first month's rent or other charges paid at the time of execution of this Agreement. In addition, Operator shall not be required to prorate Monthly Rental Charges if Customer gives notice of termination to Operator and the termination date occurs during a Rental Month for which Customer already paid the Monthly Rental Charge. However, if Customer's notice of termination includes a date of termination that is to occur during a future Rental Month, Operator shall prorate the Monthly Rental Charge for the Rental Month wherein termination occurs. Furthermore, Customer shall be entitled to a refund of any prepaid Rental Month Charges so long as Customer has not occupied the Space for any portion of the prepaid Rental Month at the time of termination.
    Customer agrees to the refund policy outlined above. Customer Initials tl
26) If Customer is in default under this Agreement, or for any other reason, Operator may terminate this Agreement by giving Customer fifteen (15) days written notice.

27) If Customer or Operator terminates this Agreement as provided above, Customer agrees to move out and completely vacate the Space on or prior to the anticipated termination date. Customer shall leave the Space in the same condition as delivered to Customer. Any property left behind will be considered abandoned property and Operator may dispose of such in a manner that Operator sees fit. If Operator is forced to dispose of any abandoned property or forced to clean the Space, Operator may charge Customer a reasonable cleaning fee, which shall be an amount no less than $50.00. Upon Customer's notice of termination, Operator may consider this Agreement terminated and may relet the Space anytime after the notification date provided. Customer shall be deemed to have conclusively abandoned all property which remains in the Space or on the Facility after the termination of this Agreement, upon default of this Agreement for thirty (30) days, or when Operator concludes based upon other reasonable considerations, including, but not limited to an unlocked Space, that Customer has abandoned Customer's property and the Space.

**AMENDING THE AGREEMENT**

28) All terms in this Agreement are **SUBJECT TO CHANGE** upon thirty (30) days written notice to Customer, including but not limited to, and without limitation, Monthly Rental Charges, late fees and other charges. Upon receiving notice of Operator's pending change(s) to this Agreement, Customer may terminate this Agreement on or before the effective date of such change by giving Operator written notice within ten (10) days of the change taking effect. If Customer does not give such notice of termination, the change shall become effective on the date stated in Operator's notice and shall thereafter apply to the occupancy hereunder, whether or not Customer has agreed to the change in writing.

**NOTICE**

29) Customer shall notify Operator of any change in Customer's address or phone number within ten (10) days of the change. Such notifications shall be (a) by certified mail, return receipt requested, postage prepaid, (b) delivered in person at the Facility's rental office (c) sent from customer via electronic mail so long as the change of address request originates from the e-mail address Operator has on file for Customer, including the e-mail address provided in this Agreement if applicable, or (d) made at www.extraspace.com via online account management. Failure by Customer to notify Operator shall constitute a waiver by Customer of any defense based on failure to receive any notice.
30) Customer recognizes it is entering into a business relationship with Operator and to the fullest extent permitted by law, expressly consents to Operator contacting Customer via phone, e-mail or text messaging for purposes relevant to Customer's account or services related to Operator's business. Customer should review Customer's phone/text plan with its servicer to see if text message fees or data service rates apply and Customer agrees to accept such charges if applicable. Except as otherwise required by law, or as otherwise provided for in this Agreement, written notices or demands may be personally served by electronic mail to the electronic mail address provided by Customer in this Agreement (or updated electronic e-mail address per separate notification as applicable) or by pre-paid first class U.S. Mail to the last known address of the party to be served, as contained in this Agreement. Such notice or demand shall be complete at on the date sent to Customer's e-mail address listed on this Agreement (or updated e-mail address per separate notification as applicable), if personally delivered (including e-mail), or on the date of pre-paid, properly addressed deposit with the U.S. Postal Service.

**MISCELLANEOUS**

31) **Agreement to Arbitrate:** By initialing below, Customer agrees that, pursuant to the Arbitration Provision on the Addendum to Agreement, either Customer or Operator may elect to resolve any dispute by neutral, binding arbitration, on an individual basis only, and not by a court action, subject to the exceptions and terms set forth in the Arbitration Provision. Please refer to the Arbitration Provision for additional information concerning the agreement to arbitrate. Customer acknowledges that he/she had the option of entering into an Agreement without an Arbitration Provision, but voluntarily chose to enter into an Agreement with an Arbitration Provision.

Customer Initials DS TC

______ Customer agrees to the Arbitration Provision
__X__ Customer refuses the Arbitration Provision

32) Customer shall not assign, sublease or jointly occupy the Space or any portion thereof without in each instance obtaining the prior written consent of Operator.
33) All of the provisions of this Agreement shall be binding upon the heirs, executors, administrators, representatives, successors and assignees of the parties hereto.
34) Operator and Customer hereby waive their respective rights to trial by jury of any cause of action, claim, counterclaim, or cross complaint, at law or in equity brought by either Operator against Customer or Customer against Operator arising out of or in any way connected with this Agreement, Customer's use or occupancy of the Space and the Facility or any claim of bodily injury or property damage, or the enforcement of any remedy under any law, ordinance, statute or regulation. Operator and Customer agree that no arbitration, small claims court proceeding or any other action or proceeding shall be brought against Operator or Customer more than one (1) year after the accrual of the cause of action or one (1) year after the claim arises, whichever is shorter, whether known or unknown when the claim arises or whether based on tort, contract or any other legal theory.
35) If Customer is not an individual, the undersigned warrants that he or she is an authorized agent of Customer.
36) If Customer or Customer's spouse is in the military service, Customer must fill out the Addendum to this Agreement regarding military. If Customer's military status (or Customer's spouse's military status) changes during the term of this Agreement, Customer must provide written notice to Operator. Operator will rely on this information to determine the applicability of the Servicemembers Civil Relief Act.
37) This Agreement contains the entire agreement of the parties and no representation or agreements, oral, or otherwise, between Operator and Customer not embodied herein shall be of any force or effect (except for written addenda agreed to between the parties).

Operator and Customer hereby execute this Agreement to be effective on the Rental Agreement Date listed above.

DocuSigned by: Joseph Bradley
A9C6FF7308994AD...
OPERATOR

DocuSigned by: Teresa Clark
2500660A26564D1...
CUSTOMER

DocuSign Envelope ID: E654D494-6D49-4607-8ADB-299B7C0D9837

# CUSTOMER PROTECTION PLAN
## THE SMART WAY TO INSURE VALUABLES

### Ensure your peace of mind. Insure your valuables.

When it comes to putting your important belongings in storage, some things are out of your control—like flood, fire, windstorms and vandalism. Homeowner's or renter's insurance policies may provide insurance coverage for property in a storage space, but it might not be enough. With the Customer Protection Plan, you have the insurance you need to store your valuables with confidence and peace of mind.

### Easy and affordable.

The Customer Protection Plan* features affordable rates and no deductible. It is a primary pay policy, meaning this coverage may work with a homeowner's policy that has a high deductible, possibly eliminating out of pocket expenses for a covered loss. When the time comes to make a claim, you'll have the help of a customer service professional. In addition to covering many losses, the Customer Protection Plan also includes In-Transit Protection providing coverage for some mishaps while you move your items from home to storage. If you have questions about which items are covered, consult your policy certificate of insurance for details.

### Important information for our customers.

Your self-storage facility is not responsible for any damage or loss to the property you store. All customers are required by the rental agreement to insure property stored at this facility. Contact your insurance agent to find out if your property stored at this location could have duplicate coverage under an existing policy. The insurance company may reinsure a substantial part of your insurance coverage with an affiliate of Extra Space Storage, which could then benefit from your purchase of this insurance. To review a Customer Protection Plan, call Beecher Carlson Insurance Services LLC at 1-800-423-6071 or email at ESSCPP@beechercarlson.com

### Comprehensive water damage protection.

Almost all standard homeowner's, renter's and storage insurance policies do not cover water that rises from the ground, like that from a flood or major thunderstorm, water main breaks or spills from an adjacent unit.

At Extra Space, Flood Protection is included with each standard policy.

### Pest protection.

Most homeowner's, renter's, and other storage insurance products do not cover rodent, insect, or vermin damage up to policy limits. The Customer Protection Plan offers this coverage for you - just another way to help bring you peace of mind (some exclusions apply). We help take the worry away.

### Insurance Rates

| STANDARD POLICY RATES | |
|---|---|
| *Limits* | *Premium Rates*** |
| $2,000 | $11.00 |
| $3,000 | $16.50 |
| $5,000 | $26.00 |
| $10,000 | $47.00 |

---

** Underwritten by companies of IAT Insurance Group*

*** Monthly premium includes premium taxes*

DocuSign Envelope ID: E654D494-6D49-4607-8ADB-299B7C0D9837

**Filing a claim is simple.**

Step 1: Contact your storage Site Manager as soon as your loss is discovered.

Step 2: Contact a trained customer service representative at Beecher Carlson Insurance Services LLC at 1-800-423-6071; or at esclaims@ACMclaims.com; or at https://www.acmclaims.com/secureforms2/claim/extraspace

Step 3: Protect your items from further damage. Do not throw out or remove the damaged property until you have reported the incident and spoken with a Beecher claims adjuster. If possible, take photos or video.

**Time is valuable. Don't wait.**
The unexpected can happen in an instant; but with the Customer Protection Plan, you can be ready. Call today to give your valuables the insurance protection they deserve.

**Beecher Carlson Insurance Services LLC**

| | |
|---|---|
| Toll-free: | 1-800-423-6071 |
| Insurance Questions: | ESSCPP@beechercarlson.com |
| Claim Questions: | esclaims@ACMclaims.com |
| 24/7 claim reporting: | 1-800-423-6071 |
| Adjusters are available | Mon – Fri: 10 a.m. – 8 p.m., EST |

The purchase of insurance through the Customer Protection Plan is not required to lease a rental space.
*Most items in securely locked storage spaces are covered by the Customer Protection Plan and any purchased rider(s). The items not covered include, but are not limited to: deeds, legal documents, money, jewelry, watches, and furs, as well as any item(s) that are kept outside of a securely locked storage unit. Burglary is a covered risk when it's the result of forced entry into a securely locked storage space. Any unearned premium will be returned to insured if policy is cancelled. This brochure is a summary of coverage only and is not a policy or a certificate of insurance. Please refer to the Certificate of Insurance itself for coverage terms, conditions, and exclusions, which apply in the event of loss.*

*This plan is available to customers of:*

**Extra Space Storage**

You deserve Extra Space.

888-STORAGE
www.extraspace.com

©2017 Extra Space Storage LLC

DocuSign Envelope ID: E654D494-6D49-4607-8ADB-299B7C0D9837

**APPLICATION FOR ACCEPTANCE OR REJECTION OF INSURANCE (MASTER POLICY: IM00002000)**

Space No.: 6010 Facility: **Extra Space Storage -** Baltimore - 602 N Howard Street

**I UNDERSTAND THAT MY PROPERTY IS STORED AT MY SOLE RISK AND THAT I HAVE AGREED TO INSURE MY PERSONAL PROPERTY FOR ITS FULL VALUE AGAINST ALL RISKS**

I also understand that the owner, landlord, lessor or operator of this storage facility:
1) Is a commercial landlord renting storage space, is not a warehouseman, and does not take custody of my property.
2) Is not responsible for any loss to my property.
3) Does not provide insurance on my property for me.

**MY CHOICE OF INSURANCE OPTIONS:**

- **Obtain from my own insurance agent**
  Your existing home or business insurance policy might provide similar coverage. We are not qualified to evaluate your policy - an insurance agent will need to provide this service.

- **Obtain insurance available through Beecher Carlson Insurance Services LLC from Occidental Fire & Casualty Company of North Carolina.**

I understand and agree that under the options below, to the extent I do not purchase insurance, insurance lapses or do not fully insure my goods, I personally assume all risk of loss of the property in my storage space.

| INITIAL | Monthly Premium | Coverage Election: $10,000.00 True |
|---|---|---|
| DS TC | $47.00 | **Added Coverage Riders:**<br>Flood $10,000.00 |

If Occupant's insurance election is to purchase insurance available through Occidental Fire & Casualty Company of North Carolina, then Occupant also acknowledges the following.

I understand the amount noted is the amount I must pay for the insurance I have selected and is due no later than the date on which my monthly rent is due. This is a maximum coverage limit. The actual amount paid in the event of loss will be determined by proof of loss documentation. I authorize the owner, landlord, lessor or operator of this storage facility to receive the premium and to send it to the insurance company on my behalf.

I hereby apply to Occidental Fire & Casualty Company of North Carolina for insurance in the amount initialed above. I have voluntarily elected to purchase this insurance. I have read and completed this application for insurance provided in the policy underwritten by Occidental Fire & Casualty Company of North Carolina. Occidental Fire & Casualty Company of North Carolina may reinsure a substantial part of your insurance coverage with an affiliate of Extra Space Storage, which would then receive information about your insurance, and could then benefit from your purchase of this insurance.

**APPLICATION PAGE**: When I have properly completed, signed this application, made the first payment of premium and received a Certificate of Storage Insurance and my coverage will be effective as of the date I signed this page, for the amount of insurance I have selected and initialed above.

I understand my insurance will continue on a month-to-month basis as long as I continue to pay the premium noted above. Failure to pay any premium in full will result in the cancellation, without notice, of my insurance.

**ELIGIBILITY**: I understand that the opportunity to purchase insurance on property stored within the building is available to all Tenants/Occupants who have entered into a Rental Agreement with the owner, landlord, lessor or operator for enclosed storage space. Coverage does not apply to property stored in a commercial office suite, retail space, parking space, other open storage areas or any other location.

**POLICY CHANGES**: I understand that I will receive one month's notice of changes to the policy and/or premium rates, and the policy and/or new rate shall be effective on the 1st of the month following the month in which advance notice of such change is provided.

**INSURANCE INFORMATION**: I have received a copy of the Customer Insurance Program Brochure and Certificate of Customer Storage Insurance. If I should need any additional information regarding this program I can call or write Beecher Carlson Insurance Services LLC at the phone number or address listed below. **For the purpose of identification and reference, the printed number of the Rental Agreement is deemed to be the certificate number assigned to the Customer Protection Plan Certificate. Beecher Carlson Insurance Services LLC is an independent licensed insurance broker which represents Occidental Fire & Casualty Company of North Carolina.**

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND CIVIL PENALTIES.

AMERICAN CLAIMS MANAGEMENT
P.O. Box 9033
Carlsbad, CA 92018
800-423-6071
Monday through Friday
10:00am to 8:00pm (Eastern Time)

**Manager of this facility is NOT an insurance agent. Please do not direct questions regarding insurance to them. Call 800.423.6071**

Tenant/Occupant Signature: DocuSigned by: Teresa Clark 2500660A26564D1... Date: 2/12/2018

Tenant/Occupant Name: Teresa Clark

DocuSign Envelope ID: E654D494-6D49-4607-8ADB-299B7C0D9837

# CERTIFICATE OF STORAGE INSURANCE

## OCCIDENTAL FIRE & CASUALTY COMPANY OF NORTH CAROLINA
## CUSTOMER PROTECTION PLAN UNDER MASTER POLICY NUMBER: IM00002000

This is to certify that the undersigned has arranged insurance as hereinafter specified and underwritten by Occidental Fire & Casualty Company of North Carolina

**DEFINITIONS:**
When used in reference to this insurance, "you" and "your" refer to the person(s) named as tenant in the Rental Agreement. "We," "us" and "our" refer to the insurance company. In addition, certain words and phrases are defined as follows:
**OWNER** – shall mean the owner, landlord, lessor or operator of the self storage facility.
**RENTAL AGREEMENT** – means the Rental Agreement executed and in effect between you and the "owner".
**INSURANCE APPLICATION** – means the "Application For or Rejection of Insurance under the Customer Protection Plan" form you completed.
**AMOUNT OF INSURANCE** – means the amount of insurance that you designated by your initials in the application for coverage.
**PREMIUM** – means the amount shown in the insurance application as premium for your insurance.

**INSURING AGREEMENT:** We will provide insurance under The Master Policy in consideration of your payment of the premium shown in the Insurance Application.
**EFFECTIVE DATE:** This insurance attaches on the date shown in the Rental Agreement. This insurance shall remain in effect until terminated or cancelled as provided by this certificate.
**PROPERTY INSURED:** We cover your personal property or the personal property of others for which you may be liable or have assumed liability prior to a loss: 1) while in storage within the enclosed storage space described in the Rental Agreement; or 2) while stored in a securely enclosed and locked vehicle or trailer and parked in a designated parking space. Vehicle, trailer and parking space are as described in the Rental Agreement. Vehicle or trailer will not be covered for any type of loss or damage, this coverage applies only to personal property securely stored inside a vehicle or trailer.

**PERILS INSURED AGAINST:** We cover direct loss to property insured by the following perils, except as otherwise excluded but limited to the amount of insurance.

a) Fire or Lightning
b) Windstorm or Hail
c) Explosion or Sonic Boom
d) Strikes, Riot or Civil Commotion
e) Aircraft, Self-propelled Missiles or Spacecraft
f) Vehicles
g) Smoke
h) Landslide, including sink hole collapse
i) Vandalism or Malicious Mischief
j) Falling objects, provided the exterior of the building containing the property is first damaged by such falling objects
k) Weight of Ice, Snow or Sleet
l) Collapse of Buildings containing the property insured, other than by earthquake
m) Water Damage except as excluded under Paragraphs (b) and (c) "Exclusions"
n) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not

**ADDITIONAL COVERAGES:** We will also provide these additional coverages up to the amounts stated below. These additional coverages do not increase the Amount of Insurance.
**BURGLARY:** 100% of the amount of insurance for each insured loss by burglary or holdup. The term Burglary shall mean the act of stealing property by forcible entry into the storage space described in the Rental Agreement; however, this coverage only applies when such storage space is securely locked at the time of the forcible entry.
**DEBRIS REMOVAL:** 20% of the amount of your insurance under the Master Policy to cover the necessary expense incurred in the removal of debris from the property insured following an insured loss.
**TRANSIT:** 100% of the amount of your insurance under the Master Policy for loss by fire or by the collision or overturn of a motor vehicle or trailer upon which covered property is being transported while such property is in transit to or from the storage space, provided the property is within 50 miles of the described storage facility. There is no coverage for damage to a motor vehicle or trailer in transit.
**EXTRA RENTAL SPACE:** 20% of the amount of your insurance under the Master Policy to cover the extra expense necessarily incurred by you for the rental of substitute storage when occupancy of the described storage space is prevented as a result of loss or damage to storage facility building by a peril insured against in this policy.
**VERMIN (RODENTS AND INSECT PESTS):** 100% of the amount of insurance for each insured loss by damage from vermin. This additional coverage only applies when no food or food residue is stored within the storage unit or if the vermin are not brought in to the storage unit by the storage unit tenant.

**EXCLUSIONS:** We do not insure:

a) Accounts, bills, currency, deeds, evidence of debt, evidence of ownership, contracts and titles, securities, negotiable instruments, money, lottery tickets, notes, animals, jewelry, watches, precious or semi-precious stones, furs, or garments trimmed with fur, breakage of glass or similar fragile articles, illegal drugs, food, alcohol and explosives.
b) Against loss or damage caused by or resulting from wear and tear, gradual deterioration, maintenance, inherent vice, latent defect, vermin (moths, insects, rodents), mold, mildew, wet or dry rot, atmospheric condition and /or changes in temperature, delay, loss of use or loss of market. Exclusion for vermin applies only if food or food residue was stored in storage unit or if tenant brought vermin on to the insured premises.
c) Against loss or damage caused by, resulting from, contributing to or aggravated by earthquake, unless fire or explosion ensues, and then we will pay only for the ensuing loss.
d) Loss or damage caused by cigarettes or other smoking materials, unless fire ensues.
e) Loss or damage caused by the neglect of the Insured to use all reasonable means to save and preserve the insured property at and after the occurrence of any peril insured against, or when the insured property is endangered by an insured peril.
f) Loss or damage caused intentionally by the Insured or at the direction of the Insured.
g) Loss or damage of contraband, or caused by illegal transportation or trade.
h) Loss or damage resulting from activity in violation of the Lease Agreement.
i) Loss or damage caused by theft or mysterious disappearance, except burglary as covered herein.
j) Losses caused by nuclear hazards:
   "Nuclear Hazard" means any nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled of however caused or any consequence of any of them. Loss caused by the nuclear hazard shall not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the "Perils Insured Against" clause.
   The insurance evidenced by this policy does not apply to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered
k) War risk and governmental action:
   The insurance evidenced by this policy does not apply to loss caused directly or indirectly by or due to any act or condition incident to the following:

   Hostile or warlike action in time of peace or war, including action in hindering, combating, or defending against an actual , impending or expected attack,
   By any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or
   By military, naval or air forces or
   By an agent of any such government, power, authority or forces, it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission or fusion shall be conclusively presumed to be such a hostile or warlike action by such governmental power, authority or forces.
   Insurrection, rebellion, revolution, civil war, usurped power or action taken by governmental authority in hindering, combating or defending against such an occurrence, and seizure or destruction under quarantine, or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade.

DocuSign Envelope ID: E654D494-6D49-4607-8ADB-299B7C0D9837

**TERMINATION OF INSURANCE:** This insurance shall automatically terminate without notice to you:
On the date your Rental Agreement is terminated;
On the first day you fail to pay the premium in full for this insurance by the monthly anniversary day, or
As provided in the Cancellation clause shown below.

**VALUATION:** The value of the property will be determined at the time of loss and will be the least of the following amounts:
The actual cash value of that property;
The cost of reasonably restoring that property to the condition immediately before loss; or
The cost of replacing that property of like kind and quality.

**OTHER INSURANCE:** If a loss is also covered by other insurance, we will pay only the proportion of the loss that this amount of insurance bears to the total amount of insurance covering the loss.

**DUTIES YOU HAVE AFTER A LOSS:** You will give prompt notice to Owner at site location and to our authorized representative, listed below, and in case of Burglary also to the police. The notice should include:
How, when and where the loss occurred;
The property involved and your interest in it; and
The names and addresses of any witnesses.

| | IF YOU HAVE A LOSS: | Beecher Carlson Insurance Services LLC | Phone # 800 – 423 - 6071 |
|---|---|---|---|
| | Telephone, write or fax: | AMERICAN CLAIMS MANAGEMENT | (New claim reporting 24/7) |
| Or email to: | esclaims@ACMclaims.com | 8390 E. Crescent Parkway, Suite 200 | (Adjusters are available from 10:00 |
| or on-line at: | https://www.acmclaims.com/secureforms2/claim/extraspace | Greenwood Village, CO 80111 | AM to 8:00 PM EST) |

**CONCEALMENT, MISREPRESENTATION AND FRAUD:** If you commit fraud by intentionally concealing or misrepresenting a material fact concerning
The insurance evidenced by this Certificate,
Covered property or
Your interest in the covered property
You will void your insurance under this policy and be subject to prosecution.

**EXAMINATION UNDER OATH:** Before recovering for any loss, if requested, you:
Will permit us to inspect the damaged property before it is disposed of or repaired;
Will send us a sworn statement of loss containing the information we request to settle your claim within 60 days of our request;
Will agree to examinations under oath at our request;
Will produce others for examination under oath at our request;
Will provide us with all pertinent records needed to prove the loss; and
Will cooperate with us in the investigation or settlement of the loss

**APPRAISAL:** If you and we do not agree as to the amount of loss, then you and we will select a competent appraiser upon receiving a written request from the other. The appraisers will select an umpire. If they do not agree on an umpire, the appraisers will ask a judge of a court of record of the state in which the appraisal is pending to make the selection. The written agreement of any two will be binding and set the amount of loss. You will pay the expense of your appraiser and we will pay for ours. You and we will share equally the expense of the umpire and the other expenses of the appraisal.

**LOSS PAYMENT/OTHER RECOVERIES:** We will pay or make good any insured loss under the insurance evidenced by this certificate within 30 days after we reach agreement with you, the entry of final judgment or the filing an arbitration award, whichever is earlier. We will not be liable for any part of a loss which has been paid or made good by others.

**LEGAL ACTION AGAINST US:** No one may bring legal action against us unless:
There has been full compliance with all terms of the insurance evidenced by this certificate; and
Such action is brought within two years after you first have knowledge of a loss.

**TRANSFER RIGHTS OF RECOVERY AGAINST OTHERS TO US:** If any person or organization to or from whom we make payment under the insurance evidenced by this certificate has a right to recover damages from another, that right must be transferred to us. That person or organization must do everything necessary to assist us, and must do nothing after the loss to hinder us in our recovery.

**PAIR, SET OR PARTS:**
Pair or Set. In case of loss to any part of a pair or set we may:
Repair or replace any part to restore the pair or set to its valuation before the loss; or
Pay the difference between the valuation of the pair or set before and after the loss.
Parts. In case of loss to any part of covered property, consisting of several parts when complete, we will pay only for the valuation of the lost or damaged part.

**OPTIONAL ARBITRATION:** Except for decisions made under the appraisal condition, in the event you and we fail to agree as to the interpretation or applicability of any of the terms of our Insurance, you may elect to resolve the disagreement by binding arbitration in accordance with the statutory rules and procedures of the state in which the property is located or in accordance with the Commercial Arbitration Rules of the American Arbitration Association. This option is granted to you subject to the following terms and conditions:
Any arbitration instituted to determine coverage for a specific loss must be started within one year after the occurrence causing loss or damage.
This optional arbitration clause is intended to grant an additional right to you. All other terms and conditions of this contract remain the same, and no rights or duties of yours or ours shall be diminished or negated by reason of this clause or exercise of this option.

**CANCELLATION:** The insurance evidenced by this Certificate may be canceled at any time by you, upon providing advanced notice in writing to us or Beecher Carlson Insurance Services LLC. Beecher Carlson will send notice to your address shown on the Rental Agreement prior to the effective date of cancellation of this certificate. The insurance evidenced by this policy shall automatically terminate in event of non-payment or partial payment of premium as provided above without further notice to you. Premium for the month of cancellation is fully earned and there shall be no return premium due you for such month. If any part of this paragraph is in conflict with specific state requirements the state requirements will apply.

**CHANGES:** This Certificate and the Master Policy contains agreements between you and us concerning the insurance afforded. This policy's terms can be amended or waived only by endorsement issued by us and made a part of The Master Policy.